**Tina SPEAR, Plaintiff–Appellant,**

v.

**Dewey SOWDERS, individually and in his official capacity as Warden of the Northpoint Training Center; and Dave Doe, Lois Doe, Lucy Doe, Phoebe Doe, Jennie Doe, Winslow Doe and Herman Doe, in their individual capacities as named unknown employees of the Northpoint Training Center, Defendants–Appellees.**

No. 93–5528.

United States Court of Appeals, Sixth Circuit.

Reargued June 14, 1995.

Decided Dec. 19, 1995.

David A. Friedman (argued and briefed), Taustine, Post, Stosky, Berman, Fineman & Kohn, Louisville, KY, for Plaintiff–Appellant.

John T. Damron (argued and briefed), Office of the General Counsel Corrections Cabinet, Frankfort, KY, for Defendants–Appellees.

Before: MERRITT, Chief Judge; KENNEDY, MARTIN, JONES, MILBURN, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, and MOORE, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which MERRITT, C.J., KENNEDY, MILBURN, NELSON, RYAN, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, JJ., joined. JONES, J. (pp. 634–36), delivered a separate opinion concurring in part and dissenting in part, in which MARTIN, DAUGHTREY, and MOORE, JJ., joined.

BOGGS, Circuit Judge.

Tina Spear[1] wanted to visit a Kentucky prison inmate. Believing that she could be bringing drugs into the prison, the prison staff refused to allow her to visit unless she submitted to a strip and body cavity search, and refused to allow her to leave without a similar search. Spear sued the various defendants (collectively referred to as "Sowders") under 42 U.S.C. § 1983 and now appeals a grant of summary judgment to the defendants on the ground of qualified immunity. A panel of this court reversed the grant of summary judgment. The court vacated that decision and placed the matter on the en banc calendar. *Spear v. Sowders*, 33 F.3d 576 (6th Cir.1994). For the reasons set out more fully below, the judgment of the district court is reversed.

1. Tina Spear is the name used in the complaint and throughout the record in this case. Appellant's brief to the En Banc Court states that Appellant's name is actually Tina Spears, but for the sake of consistency we use the name as given in complaint.

I

On October 3, 1990, Corrections Officer Brock, an employee at Northpoint Training Center, received information from a confidential prison informant that Daniel Wade, an inmate at NTC, "was receiving drugs every time a young unrelated female visitor visited." This informant had given reliable information on at least one previous occasion, which resulted in the termination of a prison guard for engaging in a romance with an inmate.

Wade had a history, stretching over a period of years, of drug offenses. On February 24, 1987, guards had found Wade with a marijuana cigarette in his possession. Fourteen months later, on May 8, 1988, guards again found Wade with two marijuana cigarettes. The next day, guards found Wade with a dime bag of marijuana. On March 29, 1989, guards again found Wade possessing marijuana, this time two cigarettes. Finally, on April 27, 1990, guards found Wade with four Darvocet pills. Prison medical authorities had prescribed these pills for Wade. However, when the medical staff distributed a pill to him, he would hold the pill in his mouth without swallowing it. He eventually accumulated four pills through this ruse.

Finally, a review of Wade's visiting record revealed that Tina Spear had been his only unrelated female visitor. No records are available with respect to visitors before 1990. On October 12, 1990, Sowders authorized a strip and body cavity search of Spear during her next visit.

Two and one-half months later, on Christmas Day, 1990, Tina Spear went to NTC to visit Daniel Wade. Upon her arrival, NTC officials informed her that she would not be permitted to visit unless she submitted to a strip and body cavity search and a search of her clothing, purse, pocketbook and car. Spear alleges, and we accept as true for purposes of summary judgment, that NTC officials told her that if she did not consent to the searches, she would be detained while they obtained a warrant, and that she would thereafter be barred from NTC. Wishing to see Wade on Christmas, she consented to the search.

A female NTC nurse conducted the strip and body cavity search with another female officer present. They had her remove her clothing and then visually inspected her body, including her vagina and her anus, and they further searched both those body cavities by inserting their fingers. NTC officials also searched Spear's clothing, purse, and pocketbook. They also searched her car, located in the NTC parking lot. Spear claims the search embarrassed, humiliated, and demeaned her. None of these searches revealed the presence of any contraband, and Spear proceeded to visit Wade.

Spear states that she has never possessed contraband at NTC, has never attempted to introduce contraband there, and has never given prison officials any cause to believe that she would attempt to introduce contraband. Also, she states that she has no criminal record of any kind.

The defendants filed a motion to dismiss, arguing that qualified immunity protected them from suit. Because the parties referred to material outside the pleadings, the judge treated the motion as one for summary judgment under Federal Rule of Civil Procedure 56. See Fed.R.Civ.P. 12(b). The district court acknowledged that Spear had a clearly established constitutional right not to be strip-searched unless the officials had reasonable suspicion that she was attempting to smuggle contraband into the prison. However, the court found that based on Wade's history of prior drug activity in prison and based upon the tip from the confidential informant, the defendants did in fact have "reasonable suspicion to target the Plaintiff for a strip search and that Plaintiff's constitutional rights were not violated by this strip and body cavity search." J.A. at 80. Consequently, the court concluded that qualified immunity protected Sowders from suit.

II

Courts have recognized a search such as the one Spear endured as "an embarrassing and humiliating experience." *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982). Nonetheless, the Fourth Amendment does not afford a person seeking to enter a penal institution the same rights that a person

would have on public streets or in a home. It is clear that a *prisoner* does not have a due process right to unfettered visitation. *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (It cannot "seriously be contended, in light of our previous cases—that an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause."). *See also Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (limiting the ability of prison regulations to create liberty interests). *A fortiori,* a citizen simply does not have a right to unfettered visitation of a prisoner that rises to a constitutional dimension. In seeking entry to such a controlled environment, the visitor simultaneously acknowledges a lesser expectation of privacy. *Blackburn v. Snow,* 771 F.2d 556, 565 (1st Cir.1985). The Supreme Court itself has pointed out that the "unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country," *Block v. Rutherford,* 468 U.S. 576, 588–89, 104 S.Ct. 3227, 3234, 82 L.Ed.2d 438 (1984), and that "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs weapons, and other contraband is all too common an occurrence." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

This conclusion is not the result of some great leap of logic. Prisons are dangerous and filled with law-breaking because that is where the criminals are. Even the most secure prisons are dangerous places for inmates, employees, and visitors. *See United States v. Fountain,* 768 F.2d 790, *modified,* 777 F.2d 345 (7th Cir.1985) (describing murders of inmates and guards in "the Control Unit of the federal penitentiary at Marion, Illinois—the maximum-security cell block in the nation's maximum-security federal prison"), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986); *Gometz v. Henman,* 807 F.2d 113 (7th Cir.1986) (describing the same murders as well as listing additional murders by members of the "Aryan Brotherhood" prison gang). Therefore, the Court has consistently "[struck] the balance in favor of institutional security," *Hudson v. Palmer,* 468 U.S. 517, 527, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393 (1984), and accorded great weight to the "professional expertise of corrections officials." *Bell,* 441 U.S. at 548, 99 S.Ct. at 1879.

The natural extension of this principle is that prison authorities have much greater leeway in conducting searches of visitors. Visitors can be subjected to some searches, such as a pat-down or a metal detector sweep, merely as a condition of visitation, absent any suspicion. However, because a strip and body cavity search is the most intrusive search possible, courts have attempted to balance the need for institutional security against the remaining privacy interests of visitors. Those courts that have examined the issue have concluded that even for strip and body cavity searches prison authorities need not secure a warrant or have probable cause. However, the residual privacy interests of visitors in being free from such an invasive search requires that prison authorities have at least a reasonable suspicion that the visitor is bearing contraband before conducting such a search.

We agree with the district court that the law was clearly established by the time of the search in this case that the Fourth Amendment required reasonable suspicion before authorizing a body cavity search. Three circuits had reached this conclusion in the mid–1980s. *See Blackburn,* 771 F.2d at 564–66; *Thorne v. Jones,* 765 F.2d 1270, 1277 (5th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 1199, 89 L.Ed.2d 313 (1986); *Hunter,* 672 F.2d at 674. This Circuit first implied that we agreed with this view in dicta in *Long v. Norris,* 929 F.2d 1111, 1116 (6th Cir.) ("searches of prison visitors during 1984 and 1985 without at least a reasonable suspicion violated clearly established law"), *cert. denied,* 502 U.S. 863, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991), and then, in *Daugherty v. Campbell,* 935 F.2d 780, 787 (6th Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992), we unequivocally held that by 1988 any reasonable prison official should have known that a visitor had a clearly established right not to be strip searched without reasonable suspicion. The district court applied this standard, and neither par-

ty disputes its viability. We see no reason to revisit the issue in this context.

██ The issue is whether Sowders had a reasonable suspicion, at the time of Spear's visit, that she would be smuggling contraband into the prison. Reasonable suspicion does not mean evidence beyond a reasonable doubt, or by clear and convincing evidence, or even by a preponderance of the evidence. Reasonable suspicion is not even equal to a finding of probable cause. Rather, reasonable suspicion requires only specific objective facts upon which a prudent official, in light of his experience, would conclude that illicit activity might be in progress.[2]

It is instructive to compare the current case with this circuit's recent opinion in *Daugherty v. Campbell*, 33 F.3d 554 (1994). In that case, the total information relied upon consisted of two letters that the warden received warning that the visitor was smuggling drugs. *Id.* at 555. However, the warden had no knowledge of who had sent the letters. One was literally anonymous and the other was signed with a fictitious name. *Ibid.* In addition, a correctional officer made the conclusory statement to the warden that the visitor was smuggling drugs, but no reasons of any sort were given for this conclusion. *Id.* at 556. Finally, the inmate suspected of being the recipient had no history of drug offenses. *Id.* at 557.

██ By contrast, in this case Sowders did not rely on an anonymous informant or a prison guard's unsubstantiated hunch. Instead he relied on a confidential informant,[3] who had provided accurate and important information on at least one prior occasion. The supposed recipient of the drug transfers was a man who had an extensive history of drug possession violations in prison. On at least four occasions, someone had smuggled those drugs into the prison at some point,

since we assume that facilities for marijuana cultivation do not exist within the NTC. Finally, the informant said that the supplier of the drugs was a "single unrelated female." A review of the visiting records demonstrated that this information, if accurate, could implicate only Spear.

While there was sufficient countervailing evidence that the likelihood of Spear being a drug smuggler was not proven beyond a reasonable doubt nor even to the extent of probable cause, that is not the standard here. There was considerably more evidence than in *Daugherty*, and it would have indeed been unreasonable for authorities not to have been suspicious in this situation. Sowders need only show that his suspicion was reasonable under the circumstances.

The Supreme Court has examined the definition of reasonable suspicion on several occasions. Each time, the Court has made it clear that "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is *less reliable* than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990) (emphasis added).

Therefore, in light of the evidence found in the record, the district court correctly concluded that there was reasonable suspicion to conduct the search.

## III

The district court did err in its resolution of Spear's allegation that NTC officials strip searched her without allowing her the oppor-

---

**2.** In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court stated that the test was whether an officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." In *Terry*, reasonable suspicion on a public street, where a citizen has far broader Fourth Amendment interests than those present when visiting a prison, amounted to the fact that three people walked up and down a

street repeatedly, looked into a store window repeatedly, and spoke amongst themselves. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**3.** Spear makes much of the fact that the confidential informant was a convicted felon. However, a criminal conviction is a prerequisite for the role of prison informant.

tunity to leave. The clearly established rights that the defendants may have violated, taking the view of the facts most favorable to the plaintiff, are the right not to be detained without probable cause, and the right not to be searched for administrative reasons without having a chance to refuse the search and depart.

Specifically, Spear claims that NTC officials told her that she could either consent to the search, or that she would be detained while they secured a warrant and then she would be forcibly searched if necessary. The prison authorities claim that they never said any such thing. As this is a motion for summary judgment, we must draw all factual inferences in favor of Spear. We assume, then, that the prison authorities told Spear she was not free to leave. Therefore, the issue is whether the detention of Spear absent probable cause violated her clearly established rights.

■■■ As we have noted, because of the need for prison security, visitors do not have the same right of unimpeded access to prisoners, without government scrutiny, that they would have to persons in society outside prison. *Bell,* 441 U.S. at 559, 99 S.Ct. at 1884–85; *Hudson,* 468 U.S. at 527, 104 S.Ct. at 3200–01. However, just as with the special circumstances that justify an electronic search by a metal detector at an airport, *see, e.g., United States v. Davis,* 482 F.2d 893 (9th Cir.1973), the government's power to intrude depends on the fact that the person insists on access. There is no authority supporting the proposition that prison officials, relying on their special power to conduct administrative searches, may search a visitor who objects, without giving the visitor the chance to abort the visit and depart. Here, Spear alleges that prison officials detained her, that such detention was without probable cause, and that they told her she would not be permitted to depart without consenting to a search. These circumstances, if proven true, would vitiate her consent and would amount to a violation of her constitutional right to be free from being detained absent probable cause. While a person may consent to less invasive searches merely by entering the facility, we do not think that a

person consents to a strip and body cavity search by simply appearing at a visiting center. Instead, the same logic that dictates that such a search may be conducted only when there is reasonable suspicion also demands that the person to be subjected to such an invasive search be given the opportunity to depart.

## IV

Finally, Spear claims that NTC officials searched her automobile without probable cause. While she consented, she alleges she consented under the same threat that she would not be permitted to leave. Again the district court incorrectly granted summary judgment, based on qualified immunity, to the defendants. However, the search of the car involves a closer question.

Here again, the dispute over crucial facts precludes summary judgment. Sowder claimed in the en banc petition and at oral argument that there is a sign at the entrance to the facility that makes it clear that automobiles are liable to be searched, and that prisoners have access to the visitor parking lot. The record contains copies of regulations governing the search of automobiles. The record does not reveal the exact scope of the search of the car or whether a sign was, in fact, visible. We cannot say, absent the resolution of these factual questions, whether the search was unreasonable and, if so, whether the law had been clearly established at the time of the search.

■■■ The Constitution protects an individual's privacy interest in an automobile. *California v. Carney,* 471 U.S. 386, 390, 105 S.Ct. 2066, 2068, 85 L.Ed.2d 406 (1985). The same Fourth Amendment standard applies whatever the area searched. *See California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). Therefore, if Sowder conducted the search for traditional law enforcement purposes he would have needed probable cause. *See Arizona v. Hicks,* 480 U.S. 321, 327, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987).

■■■ However, we have made it clear that a government official does not need probable cause to conduct every search and that a

prison visitor search falls into a special category. We cannot say that the Constitution requires individualized suspicion to search a car on prison grounds, particularly if the visitor has been warned that the car is subject to search. While the government has demonstrated individualized suspicion in most of the Supreme Court cases that have upheld warrantless searches, nevertheless the Supreme Court has made it clear that individualized suspicion is not a constitutional prerequisite in all cases. *See United States v. Martinez–Fuerte*, 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) (while "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure [the] Fourth Amendment imposes no irreducible requirement of such suspicion"); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 624, 109 S.Ct. 1402, 1417, 103 L.Ed.2d 639 (1989) ("[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unconstitutional"); *Vernonia School Dist. 47J v. Acton*, —— U.S. ——, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (upholding random drug tests of student-athletes absent individualized suspicion).

In *Romo v. Champion*, 46 F.3d 1013 (10th Cir.1995), the court held that no individualized suspicion was necessary to search a car at a roadblock on a public road leading to a prison. While the prison officials claimed that the roadblock was on prison property, the court assumed, because of the allegations in the complaint, that the roadblock was on the road itself, at a point where the only destination would be the prison. In *Romo*, prison officials conducted a search that included the opening of the trunk, a sweep of the interior and a sweep with dogs. The court held that "[r]equiring reasonable suspicion for strip searches of prison visitors is not inconsistent with our holding that the routine preliminary search of plaintiffs and their vehicle, although executed without individualized suspicion, was reasonable." *Romo*, 46 F.3d at 1019.

■ Obviously, while unpleasant, the nature of an automobile search is far less intrusive than a strip and body cavity search, and the interest in preventing the introduction of contraband remains as great. We cannot say that Spear had a clearly established right to enter a prison facility with a sign notifying her that her car would be searched, place her car in an area to which prisoners have access, enter the prison facility and then turn around and seek to leave without submitting to a search. Nor can we even say that the search of her car absent any suspicion was per se unreasonable. Because the exact contours of the search are impossible to determine from the record before us, summary judgment is inappropriate.

We agree with the point made by Spear at oral argument that prevention is the goal of an administrative search, and that is why officials search people when entering a place, for example a plane, or prison, or courthouse, and not when leaving. But it does not follow that once on the plane, or in the courthouse, or as here, on the grounds of the NTC, the administrative search exception completely disappears.

The reasoning behind this is simple in the context of a prison search. Objects hidden in a body cavity must be dislodged before transfer to a prisoner, something that could not have been done absent a contact with the prisoner. Therefore, a condition of the right to search a person is the possibility of the person coming in contact with the prisoner. However, an object secreted in a car, to which prisoners may have access, is a potential threat at all times after the car enters the grounds.

Of course it may prove true that there is no sign notifying entrants that their car may be searched, or the cars may be in a secure area to which no prisoner has access, or NTC officials may have subjected the car to such a lengthy and intrusive search that it was unreasonable. To resolve the interplay between these various factors, a determination of disputed questions of fact must be made. Therefore, the issue of the search of the car was inappropriate for resolution on summary judgment.

## V

The judgment of the district court is **AFFIRMED** in part and **REVERSED** in part.

The matter is **REMANDED** to the district court for proceedings consistent with this opinion.

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's holding that the district court inappropriately granted summary judgment. Further, I concur in the majority's basis for reversal—that the plaintiff had a right not to be detained without probable cause or searched for administrative reasons without being given a chance to refuse the search and depart. I disagree, however, with the majority's finding that the district court "correctly concluded that there was reasonable suspicion to conduct the search." Maj. Op. at 631. I do not believe reasonable suspicion existed and would reverse on that ground as well.

"[A] strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience." *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982). In this case, my concern is not merely an "embarrassing and humiliating" strip search, but a manual body cavity search. As the First Circuit has described the levels of nude body searches:

> A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Blackburn v. Snow,* 771 F.2d 556, 561 n. 3 (1st Cir.1985). Indeed, I cannot fathom any search that treads more on the dignity and privacy of an individual than a manual body cavity search. Courts have consistently recognized the overwhelming intrusiveness of searches of the body cavities. *See Bell v. Wolfish,* 441 U.S. 520, 576–77, 99 S.Ct. 1861, 1893, 60 L.Ed.2d 447 (1979) (Marshall, J., dissenting) (exclaiming that body cavity searches "represent one of the most grievous offenses against personal dignity and common decency"); *Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1445 (9th Cir.1991) (In holding that a warrantless body cavity search was

unconstitutional, the court observed that " '[t]he intrusiveness of a body cavity search cannot be overstated.' ") (quoting *Kennedy v. Los Angeles Police Dept.,* 901 F.2d 702, 711 (9th Cir.1989). *Rodriques v. Furtado,* 950 F.2d 805, 811 (1st Cir.1991) (In holding that the presence of probable cause and a warrant validated the search, the court declared that a manual body cavity search "constitut[es] a drastic and total intrusion of the personal privacy and security values shielded by the fourth amendment ... [s]earches of this nature ... implicate and threaten the highest degree of dignity...."); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983) (In finding that few exercises of state authority intrude an individual's privacy and dignity as severely as anal and genital searches, the court stated, "body cavity searches are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission,' representing the greatest personal indignity.") (citations omitted). Nevertheless, the Fourth Amendment allows such searches in limited circumstances. *See Bell,* 441 U.S. at 558–60, 99 S.Ct. at 1884–85 (1979) (approving policy requiring body cavity searches of prison inmates after contact with visitors); *Cf. United States v. Montoya de Hernandez,* 473 U.S. 531, 541 n. 4, 105 S.Ct. 3304, 3310 n. 4, 87 L.Ed.2d 381 (1985) (refusing to address the appropriateness of visual and manual cavity searches of border entrants, but allowing detention for purposes of monitoring bowel movement).

The Fourth Amendment usually requires officials to have probable cause and to obtain a search warrant before performing any search. Had Ms. Spear been at home or walking on a public street that Christmas Day in 1990, she would not have been subject to a search without such probable cause; an element that the majority admits is absent. Her mistake, however, was to visit an imprisoned loved one instead. As a prison visitor, Ms. Spear enjoyed a lessened expectation of privacy and a pendant diminished protection from search. The courts have defined a number of exceptions under which government officials may perform a search without a warrant and with less than probable cause.

In developing a "prison visitor" exception to the warrant requirement, this circuit and others have applied the "reasonable suspicion" standard developed in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to official searches of citizens who are visiting inmates. The majority correctly points out that the law is clearly established that prison officials may conduct a strip and body cavity search of a prison visitor only if the officials possess "reasonable suspicion" that the visitor is bearing contraband. *See Daugherty v. Campbell,* 935 F.2d 780, 787 (6th Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992)(affirming denial of summary judgment on qualified immunity grounds).

It must be recognized, however, that citizens do not lose all the protection of the Fourth Amendment when they visit prison. Their protection is reduced only because they have a diminished expectation of privacy and because the government has a strong interest in stopping the entry of illegal drugs and other contraband. *See, e.g., id.* at 786; *Blackburn,* 771 F.2d at 567–68. The government must maintain a reasonable suspicion to conduct the search and that reasonable suspicion requirement cannot be waived by pressured consent. *See Long v. Norris,* 929 F.2d 1111, 1116; *Blackburn,* 771 F.2d at 562–63.

Further, the reasonable suspicion requirement cannot be evaluated in a vacuum; "the totality of the circumstances—the whole picture—must be taken in to account." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Indeed, in *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982), the Eighth Circuit held that "in the absence of reasonable, articulable grounds to suspect a particular visitor of an attempt to smuggle drugs or other contraband by secreting them on his person, a strip search of that visitor is unreasonable under the fourth amendment." 672 F.2d at 675. The court noted, "the reasonable suspicion standard we have adopted requires individualized suspicion, specifically directed to the person who is targeted for the strip search," and that "[r]easonable suspicion also includes the requirement that prison officials have reasonable cause to believe that drugs or other contraband are concealed in the particular place they decide to search." *Id.* Simply put, the suspicion must be an individualized suspicion, rational and obvious when considering all circumstances, and commensurate with the scope and the type of search to be performed.

The facts in the case at bar do not manifest a reasonable suspicion. In fact, they present little more information than a case in which this court failed to find reasonable suspicion for a body cavity search. In *Daugherty v. Campbell,* 33 F.3d 554, 555 (1994), we held that the presence of an uncorroborated tip of a police officer, together with two letters from anonymous authors, alleging that Daugherty was smuggling drugs into the prison were not sufficient to create a reasonable suspicion.

In this case, when the warden authorized the search of Spear, he filled out a form indicating his justification. His sole written justification was that a confidential informant informed a prison guard that inmate Wade "was receiving drugs every time a young unrelated female visited." J.A. at 61. Since prison records for the year indicated that Spear had been the only non-related visitor that year, the warden authorized her to be searched on her next visit. The uncorroborated confidential informant's statement and the prison's record of visitors, without more, can not create a reasonable suspicion. In fact, a meticulous scrutiny of the record reveals absolutely nothing about this visitor that could appropriately constitute such suspicion.

The majority intimates the fact that Wade had been guilty of previous drug infractions while in prison casts suspicion upon Spear. Maj. Op. at 631–32. This claim is deceptive. Wade had only one drug offense in 1990, and that was for possession of four pills of the prescription drug Darvocet, a pain killer. Upon investigation within the prison, it was determined that a prison dentist prescribed Wade the pills two days before he was found with them, so it was apparent the pills were not smuggled from outside the prison. J.A. at 52. Prison searches had found Wade with small amounts of marijuana on four occasions between February 1987 and March 1989, but the prison had no record of any visit by

Spear before 1990. Thus, apart from the statement that the warden relied upon, there was absolutely no evidence even implicitly connecting *Spear* with any drugs ever found in Wade's possession, and in fact the last time Wade was found in possession of illegal drugs occurred one year and nine months before prison officials strip searched Spear. Moreover, Spear had not visited the prison during the eight weeks preceding the informant's October 3, 1990, statement to the guard.

An evaluation of all related circumstances as compelled by *Cortez,* 449 U.S. at 417, 101 S.Ct. at 695, makes it even more apparent that the strip search was unreasonable. Northpoint's own regulations required particularized reasonable suspicion for searches of the anal cavity.[1] Further, in his response to interrogatories, the warden stated that all inmates are strip searched at the conclusion of their session with visitors. J.A. at 22; *see* J.A. at 33 (prison regulations requiring inmates to be strip searched after visits). This fact alone vastly reduces the necessity to invade the privacy of a visitor, and it correspondingly narrows the circumstances in which it is reasonable to subject a visitor to a strip search. Additionally, the prison regulations state that during the visit the inmate sits facing a prison officer. *Id.* at 33. The prisoner and the visitor are allowed no more contact than holding hands, though they may kiss and embrace briefly at the beginning and end of the visit. *Id.* At this stage in the litigation, we do not know whether the prison adheres to its regulations, nor what other precautions against smuggling it takes. *See Hunter,* 672 F.2d at 676 (discussing use of solid partitions under visiting tables and screens above tables). These circumstances, however, viewed in the light most favorable to Spear, make the transfer of illegal contraband so difficult that any type of strip search would have been inappropriate unless there was a realistic probability that she was able to evade the protections, buttressed by other evidence creating a credible reasonable suspicion that she was carrying contraband.

There simply was not enough information indicating that Spear was carrying drugs to subject her to such an invasive search. The informant's identification of a "young unrelated female" was remarkably vague[2], and it was supported by no additional evidence that Wade had possessed illegal drugs at any time subsequent to any visit by Spear. Other prison protections against drug trafficking further diminished the reasonableness of the search. As there was not reasonable suspicion and because the facts casting suspicion upon Spear were so meager, making it apparent to the officials that they did not have reasonable suspicion to perform the search, the officials violated Spear's Fourth Amendment right to be free from an unreasonable search. I therefore concur in remand for further proceedings, but respectfully dissent from the majority's conclusion that reasonable suspicion was present here.

---

1. "The anal cavity shall not be visually inspected unless there shall be reasonable suspicion that contraband is being carried in the anal cavity." J.A. at 26 (Northpoint Reg. No. NTC 09-06-01). In *Long,* 929 F.2d at 1116–18, we held that qualified immunity did not bar a suit against officials who violated prison regulations stating that a strip search cannot take place without probable cause, for the regulations created a clearly established liberty interest. Plaintiffs do not predicate their suit on the Northpoint regulations, so we need not decide if *Long's* rule applies here.

2. This description is as curious as it is vague. The informant apparently chose to use the term "unrelated," rather than identifying the purported drug courier by other obvious defining characteristics. Conspicuous are the attributes of race (Spear is white, Wade is black, all of Wade's other female visitors, his mother, sister and cousin, are black), and of association with Wade (girlfriend).