UNITED STATES of America, Plaintiff,

v.

Sonya D. SHEPARD, Jacqueline R. Duncan, Defendants.

No. CR–2–96–19(1)(2).

United States District Court,
S.D. Ohio,
Eastern Division.

June 18, 1996.

Michael J. Burns, Columbus, Ohio, for plaintiff.

Steven Scott Nolder, Columbus, Ohio, for Jacqueline R. Duncan.

George C. Luther, Columbus, Ohio, for Sonya D. Shepard.

## ORDER DENYING MOTION TO SUPPRESS

DLOTT, District Judge.

This matter is before the Court on motions by Defendants Sonya Shepard and Jacqueline Duncan to suppress evidence (docs. # 28 & # 53), and the United States' responses thereto (docs. # 30 & # 55). Each of the Defendants has been charged with two counts of conspiracy and one count of importation of cocaine in violation of 18 U.S.C. § 1952 and 21 U.S.C. §§ 952(a), 960(b)(3) and 963. On June 12, 1996, the Court conducted an evidentiary hearing on Defendants' motions. Based on all the testimony—as well as the submissions of the parties—this Court has uncovered the following facts relevant to the disposition of Defendants' motions.

## I. FINDINGS OF FACT

1. Defendant Sonya Shepard is a 30 year old female American citizen who resides in Columbus, Ohio. Jacqueline Duncan is a 38 year old female American citizen who resides in Canton, Ohio.

2. In August of 1995 Defendants Shepard and Duncan—accompanied by three other women—traveled from Ohio to Miami and from Miami to Jamaica.[1] Defendants Shepard and Duncan purchased their tickets at the Air Jamaica ticket counter in the Miami International Airport on August 26, 1995. (Tr. 106, 113, 160). Both Defendants paid for their tickets in cash on the day of travel.

3. The Defendants returned to Miami on August 28, 1995, via Air Jamaica Flight Number 33. Their trip to Jamaica lasted only two days. The plane landed in Miami at approximately 3:30 p.m. and was greeted by U.S. Customs inspectors, including Inspector Rachel Thomas. (Transcript, hereinafter "Tr." 19).

4. Inspector Thomas is a customs inspector on the "Miami Rover Team." (Tr. 12). The Rover Team consists of a select group of plain clothes officers charged solely with screening international passengers for narcotics. (Tr. 12). At the time of this incident, Inspector Thomas had received 11 weeks basic training at the U.S. Customs School in Glenco, Georgia, and was nearing completion of her one year status as a "trainee." (Tr. 13).

---

1. The Defendants were accompanied on their trip by Ms. Linda Duncan, Ms. Rita Monroe, and Ms. Sarah Reed. Sarah Reed was originally indicted as a co-defendant in this case, but subsequently entered into a plea agreement with the United States. No charges were filed against Linda Duncan or Rita Monroe.

5. The Rover Team consists of approximately 30 agents, with roughly five to six agents working at any one time. (Tr. 12). Inspectors work in teams of two or more for reasons of safety. (Tr. 14). Because of the limited number of agents and the high volume of international traffic (approximately 11,000–30,000 passengers arriving each day), members of the Rover Team often target flights arriving from countries known to be primary sources of narcotics. (Tr. 15, 16). Jamaica is currently considered one of the leading source countries for cocaine arriving into the United States through Miami International Airport. (Tr. 120–121).

6. As passengers from Air Jamaica Flight # 33 disembarked from the plane, Inspector Thomas asked one or two of the women traveling from Ohio to step aside. Prior to meeting the aircraft Inspector Thomas had received a "tip" that certain individuals traveling from Ohio may be carrying narcotics. (Tr. 19, 20). Inspector Thomas' recollection was that she pulled aside the individual who she had received the tip on—and possibly one of her companions—and asked them to wait while the other passengers disembarked. (Tr. 23). Inspector Thomas testified that she believes one of the individuals she initially pulled aside was Sarah Reed. (Tr. 26). Other members of the Rover Team pulled aside two more of the group of five women traveling from Columbus. Ms. Linda Duncan was not initially asked to step aside. (Tr. 26).

7. While at the gate Inspector Thomas preliminarily questioned Sonya Shepard, Jacqueline Duncan, Rita Monroe and Sarah Reed. (Tr. 26). She checked their documentation and discovered they were on a two-day trip from a source country. (Tr. 24). The four women told Inspector Thomas that they were traveling together. (Tr. 37, 92–93, 97). They appeared nervous as she escorted them from the gate upstairs to the Immigration checkpoint. (Tr. 31–32).

8. As the group proceeded upstairs Inspector Thomas noticed a woman using the phone who appeared to be straggling behind the other passengers. Inspector Thomas approached the woman and asked for her documentation. She discovered that the woman, Linda Duncan, was also from Ohio. (Tr. 32). Inspector Thomas asked Ms. Duncan if she knew the other four women from Ohio. Linda Duncan denied knowing her traveling companions, and the four women denied knowing her. (Tr. 32). Linda Duncan appeared nervous and continued to straggle along. Inspector Thomas asked Linda Duncan to join the group, and the five women, accompanied by Inspector Thomas, proceeded downstairs to the baggage claim and customs area. (Tr. 33).

9. Inspector Thomas left the women alone to retrieve their luggage at the baggage carousel while she located two other customs agents to assist her in questioning and searching the five women. Thomas recruited Inspectors Eric Sallick and Laura Anderson to assist her in this task. Throughout this period of time Inspector Thomas retained the Customs Declarations forms of all five women.

10. Inspector Sallick has been with the Customs Service since 1991. He has been a member of the Rover Team for the past year and a half. Inspector Anderson has been employed by the Customs Service for the past three and a half years, and has served on the Rover Team for the last two and a half years. Together they have been involved in the seizure of narcotics from "hundreds" of internal carriers. (Tr. 172).

11. Inspector Thomas informed Inspector Sallick and Anderson of the circumstances surrounding her stopping the five women. (Tr. 33, 100, 158). By this time Inspector Thomas had concluded—based on the nervous behavior of the women, the short duration of their stay in a source country, and the seeming inconsistency of their story regarding Linda Duncan—that she was going to conduct a secondary inspection of their baggage.[2] (Tr. 31). Each customs agent paired

2. Officer Thomas testified that the "tip" she received prior to greeting the plane was not a factor in her decision to subject the women to a secondary examination of their luggage. (T. 59)

Q: So the tip that you're given is not used by you to determine if there is going to be a secondary examination?

off individually with one of the five passengers to conduct the luggage search and questioning.

12. Inspector Thomas searched Sarah Reed's luggage and discovered documents indicating she received government assistance. This heightened her suspicion as to how Ms. Reed could afford a two-day trip to Jamaica. (Tr. 34–35).

13. Inspector Sallick searched Defendant Jacqueline Duncan's bags and found an address book containing the name and phone number of Linda Duncan. (Tr. 104). Up until this point the two had maintained that they did not know each other and were not traveling together. Later the two admitted they were sisters and traveling together.

14. The search of the others' luggage revealed no evidence of narcotics. Following the luggage search the three inspectors conferred. (Tr. 37). They agreed to request permission from their supervisor—Alexis Coleman—to conduct pat-down searches of the women in a private inspection area. (Tr. 38). In accordance with U.S. Customs procedures, the inspectors informed Supervisor Coleman of the following articulable facts that led them to believe a patdown search was warranted: 1) the continued nervousness of the women; 2) the fact that the women had been on a short trip to a source country; and 3) the fact that some of the women, including Defendant Duncan, were wearing loose fitting clothing.[3] (Tr. 36–37, 82–83, 104–105, 158–159). Supervisor Coleman granted permission for the pat-down searches.

15. The women were taken individually to a small search room accompanied by the two female inspectors, Thomas and Anderson. They were informed of the procedures for a pat-down search. Each woman was searched by one of the female inspectors while the other inspector stood nearby as a witness.

Inspector Sallick was not present for any of the pat-down searches. No evidence of narcotic smuggling was uncovered during the pat-downs. (Tr. 39–41).

16. After the pat-down searches the three agents once again conferred. They continued to suspect that Shepard, Reed and Jacqueline Duncan may be carrying narcotics. (Tr. 44). The agents decided, however, to release Linda Duncan and Rita Monroe. Linda Duncan had been in Jamaica longer than the other women and claimed to have been visiting a boyfriend there. The agents found this story more credible. (Tr. 35, 165). Monroe appeared less nervous than the other women. She told the inspectors that she had recently had surgery and displayed an abdominal surgical scar. Because of these facts the inspectors did not think it likely that Monroe was concealing contraband on her person. (Tr. 35, 166).

17. At this point the agents questioned the remaining three women one-on-one for approximately 45 minutes: Inspector Thomas paired with Sarah Reed, Inspector Sallick paired with Jacqueline Duncan and Inspector Anderson paired with Sonya Shepard.

18. Following this additional questioning the agents once again conferred and concluded that they believed Reed, Shepard and Duncan were internal drug carriers. (Tr. 44, 112). In accordance with U.S. Customs procedures Inspector Thomas sought and received permission from Supervisor Coleman to transport her passenger—Sarah Reed—to the hospital for a body cavity and/or an x-ray examination. (Tr. 44).

19. In order to obtain permission for the body cavity search Inspector Thomas was again required to recite articulable facts that led her to conclude Sarah Reed was an internal drug carrier. (Tr. 44). In support of this belief Inspector Thomas stated that: 1)

A: No, because there is hundreds of people that I have encountered that there have been tips on that I have talked to them, and the initial encounter is I don't think anything.

3. There is some confusion in the testimony as to whether each agent individually approached Supervisor Coleman to request permission for a pat-down search of their individual passenger(s), see Testimony of Officer Thomas, T. 82, or wheth-

er one agent went to Supervisor Coleman and requested the pat-down searches for all five women, see Testimony of Officer Anderson, T. 163, 187. Whether it was done individually or collectively, the reasons articulated by the agents for requesting the pat-down searches were substantially the same and thus the Court does not find this discrepancy particularly troubling.

Sarah Reed was very nervous (her carotid artery was pulsating and her hands were shaking); 2) her voice was weak and shaking; 3) she had taken a short two-day trip to a source country; 4) she maintained that during the trip she traveled from Kingston to Montego Bay, which Inspector Thomas believed to be some distance away; 5) documents showed she was on government assistance; and 6) portions of the three womens' stories were conflicting. (Tr. 36–37, 44, 89). Based on this information, Supervisor Coleman approved the transport of Sarah Reed to the hospital for further medical examination. (Tr. 44, 88).

20. Inspector Sallick approached Supervisor Coleman to request permission for a further medical examination of Jacqueline Duncan. Sallick testified he informed Supervisor Coleman that Jacqueline Duncan exhibited signs of nervousness—including a pulsating carotid artery and delayed responses to his questions—and that she had offered conflicting stories about her trip and her relationship with Linda Duncan. (Tr. 112, 134, 135). Inspector Sallick also cited Ms. Duncan's unemployment and bulky clothing as influencing his decision to seek further examination. (Tr. 132–33, 137).

21. Inspector Anderson approached Supervisor Coleman to seek permission for a pelvic examination of Sonya Shepard. (Tr. 187). The factors she recited were the same as the reasons she offered for the pat-down search: the short stay, the girls' itinerary which included a trip from Montego Bay to Kingston, and the inadequacy—from Inspector Anderson's perspective—of the girls' proffered reason for travel. (Tr. 159, 190). Supervisor Coleman signed the form granting consent for a medical examination.

22. Before transporting the women to the hospital Inspector Sallick read Jacqueline Duncan her Miranda rights and informed her of his belief that she was an internal drug carrier. (Tr. 114). Defendant Duncan waived her Miranda rights and consented to a pelvic examination at the hospital. (Tr. 114). Jacqueline Duncan repeatedly told Inspector Sallick that she was afraid. (Tr. 114–115). She admitted to Inspector Sallick that she had inserted something in her vagi-na and asked to be taken to the restroom. (Tr. 115).

23. Defendant Duncan was escorted to the restroom by Inspectors Thomas and Anderson. (Tr. 167–168). While in the restroom she voluntarily produced a can shaped cylinder containing 0.57 pounds of cocaine. (Tr. 168). She was then led back to the search room in handcuffs in front of Ms. Reed and Ms. Shepard. (Tr. 169). The substance she produced field tested positive for cocaine and Jacqueline Duncan was arrested.

24. After seeing Ms. Duncan in handcuffs Defendant Shepard approached Inspector Sallick and told him that she too had something inside her. (Tr. 150). Ms. Shepard was escorted to the restroom and voluntarily produced a vaginally inserted vessel containing 0.59 pounds of cocaine. She too was arrested.

25. Prior to producing the cocaine Inspector Anderson had informed Ms. Shepard of her belief that she was an internal drug carrier and of U.S. Customs procedures, which included transport to a hospital for medical examination. (Tr. 170). Ms. Shepard refused to consent to the pelvic examination. However, after producing the cocaine, all three women were transported to the hospital to determine if there was any additional contraband lodged inside their bodies, and at that time Ms. Shepard did sign the form consenting to a pelvic examination.

## II. DISCUSSION

The Fourth Amendment to the Constitution protects individuals against unreasonable searches and seizures. Determining what is "reasonable" within the context of the Fourth Amendment requires an examination of all the circumstances and the nature of the search or seizure. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985) (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 337–342, 105 S.Ct. 733, 740–743, 83 L.Ed.2d 720 (1985)). It is well-settled, however, that searches at an international border are subject to a qualitatively different standard of reasonableness than those conducted in the interior. *See, e.g., United States v.*

*Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 3308–3309, 87 L.Ed.2d 381 (1985). Courts have long held that "routine" border searches of persons and their effects are not subject to any requirement of reasonable suspicion, probable cause, or a warrant. *Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. at 3308 ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.").

 A number of courts have struggled, however, with the issue of what qualifies as a "routine" border search. In general, the degree of invasiveness or intrusiveness associated with the search determines whether or not it is considered routine. *See United States v. Braks,* 842 F.2d 509, 511–12 (1st Cir.1988) (highlighting factors cited by the Supreme Court and several Courts of Appeals for determining the invasiveness of a search). Perhaps the only type of searches consistently held to be "non-routine" are strip and body cavity searches. *See e.g., Braks,* 842 F.2d at 512–13. These types of non-routine searches at the border are subjected to a higher level of scrutiny than are routine searches. In order to justify a strip or body cavity search, the United States must show that it had a "reasonable suspicion" the party to be searched was guilty of illegal concealment. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. at 3310–3311; *United States v. Gonzalez–Rincon,* 36 F.3d 859, 868 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1323, 131 L.Ed.2d 203 (1995); *United States v. Ogberaha,* 771 F.2d 655, 658 (2d Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986).

How to measure whether law enforcement possessed the "reasonable suspicion" necessary to conduct a non-routine search at the border is also subject to various interpretations. Some courts employ a balancing approach, in which the strength of the suspicion required for a search increases as the level of intrusiveness of the search increases. *United States v. Vega–Barvo,* 729 F.2d 1341, 1344 (11th Cir.1984); *Gonzalez–Rincon,* 36 F.3d at 868 (Nelson, J. dissenting) ("It is well-established that, all else equal, the greater the indignity or invasion of privacy occasioned by a search, the greater the quantum of evidence necessary to justify the search."). This approach attempts to balance the privacy interests of the international traveler against the Government's legitimate interest in controlling the flow of illegal contraband into our nation. *Vega–Barvo,* 729 F.2d at 1344.

Other courts have developed a laundry list of potential factors to consider, and weigh the totality of the circumstances in reaching their decision. *United States v. Asbury,* 586 F.2d 973 (2d Cir.1978). In *Asbury* the Court surveyed the case law pertaining to border searches and culled together a list of twelve factors a court may take into account in determining reasonableness: (1) excessive nervousness; (2) unusual conduct; (3) an informant's tip; (4) computerized information showing pertinent criminal propensities; (5) loose-fitting or bulky clothing; (6) an itinerary suggestive of wrongdoing; (7) discovery of incriminating matter during routine searches; (8) lack of employment or a claim of self-employment; (9) needle marks or other indications of drug addiction; (10) information derived from the search or conduct of a traveling companion; (11) inadequate luggage; and (12) evasive or contradictory answers. *Id.* at 976–77. Most cases upholding the legality of a non-routine search rely on a combination of the these factors, rather than on any one factor standing alone. *Id.* at 977.

 While the Sixth Circuit has not directly ruled on the meaning of "reasonable suspicion" in the context of a body cavity search at an international border, the Sixth Circuit just recently addressed the issue of what constitutes "reasonable suspicion" to justify a body cavity search at a federal penitentiary. *Spear v. Sowders,* 71 F.3d 626 (6th Cir.1995) (en banc opinion). Courts have long recognized that searches at federal prisons—similar to searches at an international border—involve a lesser degree of Fourth Amendment protection. *Id.* at 629–30 ("[T]he Fourth Amendment does not afford a person seeking to enter a penal insti-

tution the same rights that a person would have on public streets or in a home."). The Sixth Circuit in *Spear*—speaking en banc—described "reasonable suspicion" as follows:

> Reasonable suspicion does not mean evidence beyond a reasonable doubt, or by clear and convincing evidence, or even by a preponderance of the evidence. Reasonable suspicion is not even equal to a finding of probable cause. Rather, reasonable suspicion requires only specific objective facts upon which a prudent official, in light of his experience, would conclude that illicit activity might be in progress.

*Spear*, 71 F.3d at 631. Not only is the reasonable suspicion standard less demanding than probable cause in that it "can be established with information that is different in quantity or content," a reasonable suspicion "can arise from information that is less reliable than that required to show probable cause." *Spear*, 71 F.3d at 631 (quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990)).

 Although Defendants in this case were not actually subjected to a body cavity search, the customs agents sought and obtained permission to transport them to a hospital for such an examination. Moreover, the agents informed both Defendants of their "procedures" and intention to seek a pelvic examination. (Tr. 114, 184). The Court finds that "reasonable suspicion" was not necessary for the customs agents to conduct the initial pat-down searches of the Defendant. *See Gonzalez–Rincon*, 36 F.3d at 864 ("Strip searches and body-cavity searches are of course considered nonroutine, and unlike luggage searches and pat-downs, must be supported by reasonable suspicion"); *United States v. Oyekan*, 786 F.2d 832, 835 (8th Cir.1986) (pat-down search held routine); *United States v. Sandler*, 644 F.2d 1163, 1167 (5th Cir.1981). Once, however, the customs agents decided to pursue further intrusive searches and informed the Defendants of their intention to do so, the customs agents were required to have a "reasonable suspicion" that Defendants were internal carriers of narcotics. *See United States v. Himmelwright*, 406 F.Supp. 889, 893 (S.D.Fla.1975), *aff'd* 551 F.2d 991 (5th Cir.) *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) (custom agent directing a passenger to remove an object from inside her person—without any physical contact—constituted a search of the person).

 Defendants argue that the facts of this case reveal Inspectors Thomas, Sallick and Anderson maintained no more than an "inchoate hunch" they were carrying narcotics. (Tr. 203). The fact that the hunch turned out to be correct offers no legal justification for the search. (Tr. 205). The Court agrees that a mere hunch a passenger is transporting narcotics—even at the border—is not enough to justify a non-routine search of that individual. Citizens traveling abroad—just like citizens seeking to visit a federal prison—do not loose all protection of the Fourth Amendment simply by returning to the country. *Spear*, 71 F.3d at 635 (Jones, J., concurring in part and dissenting in part) ("[Prison visitors'] protection is reduced only because they have a diminished expectation of privacy and because the government has a strong interest in stopping the entry of illegal drugs and other contraband."). Once, however, customs officials reasonably suspect that an international traveler is smuggling narcotics, they may detain him or her and perform the searches necessary to verify or dispel that suspicion. *Gonzalez–Rincon*, 36 F.3d at 864.

The Court finds that the facts of this case demonstrate the customs agents possessed reasonable suspicion to believe Defendants Shepard and Duncan were smuggling illegal contraband. Jacqueline Duncan was returning from a short, two-day trip to Jamaica, one of the leading sources of cocaine smuggled into this country. She paid for her ticket in cash on the day of travel. She told customs agents that she was unemployed at the time. She lied to customs officials about her relationship to Linda Duncan, her sister and traveling companion. She was wearing loose fitting and bulky clothing. Finally, she exhibited physical signs of nervousness including a pulsating carotid artery and did not appear to calm down even after extensive questioning by customs agents.

Similarly, the Court finds that a reasonable customs agent would have had reason to

suspect Sonya Shepard was carrying cocaine. She too was returning from a short, two-day trip to Jamaica. She also purchased her ticket in cash on the day of travel. Although no inconsistencies were attributed directly to Ms. Shepard, she admitted to traveling with Ms. Duncan who had misled customs officials. *See United States v. Holtz,* 479 F.2d 89, 91 (9th Cir.1973) ("those facts derived from 'the companions of the subject of the strip search can be considered in determining when such a search may be justified' ") (quoting *United States v. Gil de Avila,* 468 F.2d 184, 186 (9th Cir.1972), *cert. denied,* 410 U.S. 958, 93 S.Ct. 1428, 35 L.Ed.2d 692 (1973)). Another of Ms. Shepard's traveling companions—Ms. Sarah Reed—was found to be a recipient of government assistance, which called into question her means to afford such a vacation. Both Reed and Duncan claimed they were unemployed. According to the testimony of Agent Anderson, Shepard appeared nervous and could not adequately explain why the women had traveled from Ohio to Miami and Miami to Jamaica for a two-day vacation. The account of their itinerary during their two days on the island—travel from one side of the island to the other—also appeared suspicious.

The customs inspectors in this case all had prior experience with border seizures as part of Miami International Airport's Rover Team. They were familiar with the factors that should alert them that an individual might be attempting to smuggle contraband across the border. While any one factor standing alone might not be enough to arouse a reasonable suspicion that an individual is carrying contraband, a combination of more than one factor typically will satisfy the standard of reasonable suspicion. *Asbury,* 586 F.2d at 977.

### III. CONCLUSIONS OF LAW

Based on all of the foregoing the Court makes the following conclusions of law:

1. Under the particular facts and circumstances established in this case, a sufficient level of reasonable suspicion existed to support the actions taken by the customs officers.

2. The conduct of the customs inspectors was within the constitutional bounds of the Fourth Amendment.

Accordingly, Defendants' motion to suppress the evidence obtained in this case is hereby **DENIED.**

**IT IS SO ORDERED.**