[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 11, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-15310

_____

D. C. Docket No. 04-00053-CR-CB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARLEASE PREVO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(January 11, 2006)**

Before ANDERSON, BLACK and CARNES, Circuit Judges.

CARNES, Circuit Judge:

On August 13, 2000, Arlease Prevo drove her car to the Loxley Work Release Center, a correctional facility in Alabama. She went there to pick up an inmate, Derrick Wise, who was serving a ten-year sentence on drug charges; he had an eight-hour pass permitting him to leave the center. Twice in the preceding two weeks (on July 30 and August 6) Prevo had driven to the facility, signed out Wise on eight-hour passes, and then driven him back when he was due to return. On three other occasions earlier in the year (April 30, May 14, and May 28), Prevo had driven to the center and visited Wise there. All told, in the preceding three-and-a-half months Prevo had driven her car onto the work release center property on seven occasions.

On this occasion, as on all seven previous ones, when Prevo drove off the public roadway through the entrance to the center property, she drove past two large signs, one above the other, that were posted on the right side of the entrance, just off the roadway. The top sign was approximately three feet high and four feet wide, and it stated in three-and-a-half inch capital letters:

ANY
VEHICLE BEYOND
THIS POINT IS
SUBJECT TO
SEARCH

2

Immediately below that sign hung another one that was approximately four feet

high and four feet wide.  It stated in two-and-a-half inch capital letters:

THE FOLLOWING ITEMS
ARE NOT AUTHORIZED
ON THIS PROPERTY
1. FIREARMS
2. ALCOHOLIC BEVERAGES
3. ILLEGAL OR NARCOTIC
SUBSTANCES OF ANY
KIND
ANYONE TRANSPORTING
OR POSSESSING THESE
ITEMS WILL BE
SUBJECT TO CRIMINAL
PROSECUTION


The two signs stood by themselves, surrounded by no other potential distractions,

in clear view of visitors coming onto the work release center property.

On this occasion, as on the seven previous ones, when Prevo drove off the

public roadway onto the work release center property, she passed the two signs and

continued driving on a winding road approximately fifty yards to the parking lot,

which is adjacent to the center's buildings.  There was a difference this time,

however.  On the seven earlier occasions Prevo had gone to the center, no one was

conducting searches.  This time law enforcement officers, with the help of drug

detection dogs, were searching all vehicles entering the visitor parking lot.  The

3

primary purpose of this kind of search is to keep weapons and drugs out of the work release facility.

While Prevo was in her car, officers approached it. Sergeant Kerry Mitchum of the Loxley Police Department asked Prevo if she had any weapons or drugs in the car. When she did not respond, he repeated the question. Prevo, with the engine of her car still running, told Sergeant Mitchum that she wanted to leave. He told her it was too late to leave and instructed her to turn off the engine and exit the vehicle.

Prevo complied and informed the officers that she had a gun in her purse on the front seat. It was a .22 Magnum five-shot revolver, loaded with two live and three spent cartridges. With the help of drug detection dogs, the officers also found a crack pipe, crack cocaine, and $22,991.00 in cash in the trunk of the car.

Prevo was charged in a two-count indictment with possession of cocaine base, in violation of 21 U.S.C. § 844(a), and with possession of a firearm by an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). She filed a motion to suppress, on Fourth Amendment grounds, the physical evidence that was seized and the statements she made to the officers about the search. The district court denied the motion. As part of an agreement Prevo pleaded guilty to the gun charge, and the drug charge was dropped. Her plea was

4

conditioned on retaining the right to appeal the district court's denial of her motion to suppress.

This is her appeal of that denial. The only issue before us is whether the search of Prevo's car on the work release center property violated her Fourth Amendment rights. We decide the issue de novo. All the relevant facts are undisputed.

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. Amend. IV. Generally, a search is reasonable under the Fourth Amendment when supported by a warrant or when the search fits within an established exception to the warrant requirement. The Fourth Amendment reasonableness inquiry is a balancing test that weighs the need for the search, including its likely effectiveness in averting potential harm to the public, against the degree and nature of the intrusion into a citizen's privacy interests. Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 453–55, 110 S. Ct. 2481, 2487–88 (1990); United States v. Skipwith, 482 F.2d 1272, 1275 (5th Cir. 1973).[1] It is a context-specific inquiry. Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884 (1979) ("Courts must consider the scope of the particular

_____

[1] Fifth Circuit decisions rendered prior to the close of business on September 30, 1981 are binding precedent on this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

5

intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."). In short, the test is reasonableness in light of all the circumstances.

As for the justification behind the search in this case, sometimes it is helpful to state the obvious. Prisons house people who have proven themselves unable or unwilling to obey the law. Most prisoners have more than a passing acquaintance with illegal drugs. Dep't of Justice, Bureau of Justice Statistics, Substance Abuse and Treatment, State and Federal Prisoners, 1997 3-4 (Jan. 1999) (eighty-three percent of state prisoners reported past drug use and fifty-seven percent reported using drugs in the month before their offense). Most of them are sociopaths. See Eddings v. Oklahoma, 455 U.S. 104, 126 n.8, 102 S. Ct. 869, 883 n.8 (1982) (Burger, C.J., dissenting, joined by White, Blackmun, and Rehnquist, JJ.) (citing testimony estimating that 91% "of your criminal element" would test as sociopathic or antisocial); Clisby v. Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994). Some of them are violent. See Hudson v. Palmer, 468 U.S. 517, 526, 104 S. Ct. 3194, 3200 (1984) ("Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct.").

Because of the character of prisoners and the nature of imprisonment, corrections facilities are volatile places, brimming with peril, places where security is not just a operational nicety but a matter of life or death importance. See Bell, 441 U.S. at 559, 99 S. Ct. at 1884 ("A detention facility is a unique place fraught with serious security dangers."). That is why the Supreme Court has decided that even when a prison restriction or practice "infringes a specific constitutional guarantee, . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Id. at 547, 99 S.Ct. at 1878. Among the most critical security measures are those employed to keep contraband, like the loaded pistol and cocaine found in Prevo's car, away from prison property and out of prison facilities. See id. at 559, 99 S. Ct. at 1884 ("Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence."); Hudson, 468 U.S. at 527, 104 S.Ct. at 3200 (Corrections officials "must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison . . . .").

Of course, walls and posted signs cannot banish the Fourth Amendment from prisons, but the nature of inmate populations and the necessity of keeping

7

contraband out of prison facilities does factor heavily in the determination of what is reasonable. As we, through our predecessor court, put it nearly thirty years ago: "That which would be unreasonable in the outside world may be indispensable within a prison." Newman v. Alabama, 559 F.2d 283, 291 (5th Cir. 1977) aff'd in part, rev'd in part, sub nom. Alabama v. Pugh, 438 U.S. 781, 98 S. Ct. 3057 (1978). In the same decision, we also had this to say: "Prison authorities have both the right and the duty by all reasonable means to see to it that visitors are not smuggling weapons or other objects which could be used in an effort to escape or to harm other prisoners." Id.

Searching automobiles that come onto prison property is an obvious way to keep contraband away from prisons. Nonetheless, Prevo argues that searches of automobiles in the parking lot generally will be ineffective at a work release center where inmates are regularly allowed out on passes and there is no way to ensure that they will not have access to contraband off prison property. The standard of constitutionally, however, is not one of perfect effectiveness, and prison officials are not required to permit inmates to have more convenient access to contraband simply because they cannot cut it off entirely.

The Supreme Court has instructed us that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," and

"[p]rison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547, 99 S. Ct. at 1878. In the judgment of prison administrators, the unscheduled search of automobiles in the visitors parking lot of this work release center will help reduce the flow of contraband into the facility. Our deference to their expertise on the subject is bolstered by one trenchant fact. Whatever else may be said about the effectiveness of the search policy, it did work in this case. It prevented Prevo from giving an inmate access to the cocaine and loaded pistol in her car. For Prevo, who was caught, to complain that the search policy is ineffective is like a law school graduate who flunked the Bar complaining that the exam is too easy to do any good.

Prevo also argues that searching automobiles in the parking lot is unreasonable because the goal of keeping contraband out of a corrections facility can be attained by searching everyone, whether visitor or returning inmate, who enters the facility. Entrance searches are performed at this work release center, and Prevo says that is enough. We defer to the common sense judgment of corrections officials that two layers of searches, a double-tier of deterrence, is better than just one. Searches are not infallible because, among other things, those conducting

9

them are not. More searches, or the threat of them, provide more security than fewer searches do.

Visitors are signed into and out of this detention facility on a regular basis. They enter and leave it through the visitors parking lot, as do inmates who are picked up and dropped off as part of the pass program. Even if we assume that Prevo was not attempting to smuggle the loaded pistol and cocaine into the center, it would have remained in her car (the pistol on the front seat), accessible to prisoners passing by who were inclined to wrongdoing. As the Sixth Circuit has noted, "an object secreted in a car, to which prisoners may have access, is a potential threat at all times after the car enters the [prison] grounds." Spear v. Sowders, 71 F.3d 626, 633 (6th Cir. 1995). Prevo was, after all, there to sign out of the facility a convicted drug offender. Her intent was to take him to her car which had the loaded pistol on the front seat and the illegal drugs in the trunk. At least where inmates have access to cars parked in prison facility parking lots, a search of the vehicle is reasonable. Id. ("We cannot say that the Constitution requires individualized suspicion to search a car on prison grounds, particularly if the visitor has been warned that the car is subject to search."); Neumeyer v. Beard, 421 F.3d 210, 214-15 (3d Cir. 2005); see McDonnell v. Hunter, 809 F.2d 1302,

10

1309 (8th Cir. 1982) (finding that "it is not unreasonable to search vehicles that are parked within the institution's confines where they are accessible to inmates").

Prevo contends that "less intrusive" means of keeping contraband out of the work release center exist, and she suggests these: "searching visitors when they enter the facility, searching residents when they return from off-site visits, not allowing residents in the parking lot, monitoring residents in the parking lot, and running drug dogs around cars parked in the parking lot." Appellant's Br. at 22. Suffice it to say that the Fourth Amendment does not require the least intrusive alternative; it only requires a reasonable alternative. See Romo v. Champion, 46 F.3d 1013, 1016 (10th Cir. 1995) (finding a prison visitor vehicle search reasonable where prison officials set up a road block on a road leading to a prison, and noting that the Fourth Amendment does not require "the best possible alternative").

On the other side of the scale is the privacy interest of the person who drives her automobile onto prison grounds to pick up an inmate. There is a diminished expectation of privacy in an automobile to begin with. See Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485, 2487 (1996); Bourgeois v. Peters, 387 F.3d 1303, 1315 (11th Cir. 2004). Subtract from that the reduction in privacy that one can reasonably expect when going onto prison grounds, and there is not much

11

left.  See Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996); Spear, 71 F.3d at 632.  Whatever little expectation of privacy might otherwise remain is rendered negligible by the two signs warning visitors that cars entering the property are subject to search.  See Spear, 71 F.3d at 633.  Prevo drove past the two warning signs not once, which would have been enough, but seven times.  She had no realistic expectation of privacy in the contents of her car.

Prevo contends that even if the search were reasonable had she insisted on completing her mission of picking up the inmate, it became unreasonable once she asked to leave without her car being searched.  This brings to mind our decision in United States v. Herzbrun, 723 F.2d 773 (11th Cir. 1984).  In that case Herzbrun, a would-be airline passenger, presented himself at a security checkpoint where posted signs warned that those passing through it would be subject to search.  Id. at 774.  Herzbrun placed his shoulder bag on the conveyer belt that fed it into the X-ray machine and then walked through the magnetometer.  Id.  The X-ray operator noticed a large unidentifiable mass at the bottom of the bag and decided that the suspicious object warranted a further search of the bag.  Id.  After some discussion, Herzbrun refused to allow the operator to search the bag, told her and an officer that he did not want to board the airplane, and "made a hasty retreat toward the nearest exit and taxi stand."  Id. at 774–75.  He was arrested and his shoulder bag

12

seized. Id. at 775. Officers found cocaine in it, and he was prosecuted. Id. We held that when Herzbrun presented himself at the airport security checkpoint, he implicitly consented to the search of his bag, and he could not revoke that consent once those conducting the security procedures decided to perform the search. Id. at 776–78; accord United States v. Skipwith, 482 F.2d at 1281; United States v. DeAngelo, 584 F.2d 46, 48 (4th Cir. 1978).

Any other result would not make sense at security check points in airports or in prison parking lots. We quoted in Herzbrun the explanation we had given in Skipwith for not allowing those carrying contraband to have a get-out-of-search-free card: "Such an option would constitute a one-way street for the benefit of a party planning airport mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful." Herzbrun, 723 F.2d at 776 (quoting Skipworth, 482 F.2d at 1281 (Aldrich, J., dissenting) (adopted in part by the panel majority, id. at 1277)) (internal quotation marks omitted). As we observed, "[e]stablished search procedures are more valuable for what they discourage than what they discover." Id. Any policy that reduces the likelihood of a successful search will decrease the risk to the wrongdoer. A policy allowing the wrongdoer to back out on the brink of discovery reduces the risk to zero, leaving her free reign to probe the security measures until an opening is found.

13

That is essentially what Prevo wants. She urges us to follow the decision in Gadson v. State, 668 A.2d 22 (Md. 1995). The motorist in that case was stopped at a checkpoint on an access road leading into a prison. Id. at 25. The officer refused his request that he be allowed to turn around rather than have his automobile searched. Id. The Maryland Court of Appeals held that the resulting search was unconstitutional because once the motorist expressed a desire to leave, the goal of keeping drugs out of the prison had been accomplished. Id. at 28–30. That decision is poorly reasoned because it ignores the deterrent value of this type of search. We believe that the Fourth Amendment protects individuals from unreasonable searches and seizures; it does not assure them that they will not get caught when violating the law.

Prevo informs us that the Alabama Department of Corrections has recently adopted a policy that states: "All vehicles are subject to be searched. If the driver refuses to have the vehicle searched, [she] may be permanently restricted from visiting at any [Alabama Department of Corrections] institution." Prevo reads into this new policy a right for a visitor to leave rather than have her car searched, but even assuming that her reading of it is a correct one, the revised policy was not in effect at the time Prevo's car was searched. Even though it was not adopted until four-and-a-half years after the search in this case, Prevo argues that its existence

14

still supports her position that the officers acted unconstitutionally in not permitting her to leave without a search. The core fault in this argument is that the scope of the Fourth Amendment is not dependent on the willingness of the government to exercise its full powers. Nothing requires a governmental entity to exercise all the powers that it has, and timidity in exercising them does not shrink the scope of what is constitutionally permissible any more than boldness in exercising power expands the scope of it.

Finally, Prevo insists that even if the search is otherwise constitutionally permissible, it still violates the Fourth Amendment because the search program vested too much discretion in the officers conducting the search. See, e.g., Delaware v. Prouse, 440 U.S. 648, 661, 99 S. Ct. 1392, 1400 (1979) (finding unreasonable a traffic stop and detention program in part because it vested the ultimate decision of which vehicles to stop in "the unbridled discretion of law enforcement officials . . . in the field"). There is no factual basis for this argument. According to the stipulated facts, "[a]ll vehicles entering the parking area were being stopped and searched that day." The concern about giving officers unbridled discretion in deciding which vehicles to search is that they may target certain individuals on impermissible grounds such as race or ethnicity. See Neumeyer,

15

421 F.3d at 215-16. That danger is not present where all cars at a given place on a particular day are searched. Uniform treatment is the antithesis of discrimination.

For these reasons, we conclude that the search of Prevo's car was reasonable under the circumstances; it did not violate the Fourth Amendment. The judgment of conviction, which was conditioned on the correctness of the order denying the motion to suppress, is AFFIRMED.