**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| TINA CATES, *Plaintiff-Appellant*, | No. 18-17026 |
| v. | D.C. No. 2:17-cv-01080-GMN-PAL |
| BRUCE D. STROUD; BRIAN WILLIAMS, SR.; JAMES DZURENDA; ARTHUR EMLING, JR.; MYRA LAURIAN, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, District Judge, Presiding

Argued and Submitted May 29, 2020
San Francisco, California

Filed September 25, 2020

Before: William A. Fletcher, Jay S. Bybee, and
Paul J. Watford, Circuit Judges.

Opinion by Judge W. Fletcher

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's summary judgment for defendants in an action brought pursuant to 42 U.S.C. § 1983 and state law alleging that plaintiff's constitutional rights were violated when she was, among other things, subjected to a strip search upon arriving at a prison to visit her boyfriend.

The panel held that plaintiff's unconsented strip search was unreasonable under the Fourth Amendment. The panel held that even if there was a reasonable suspicion that plaintiff was seeking to bring drugs into the prison (a question the panel did not reach), the criminal investigator who performed the search violated plaintiff's rights under the Fourth Amendment by subjecting her to the search without first giving plaintiff the option of leaving the prison.

The panel held that prior to the panel's decision in this case, there had been no controlling precedent in this circuit, or a sufficiently robust consensus of persuasive authority in other circuits, holding that prior to a strip search a prison visitor—even a visitor as to whom there is reasonable suspicion—must be given an opportunity to leave the prison rather than be subjected to the strip search. Accordingly, because at the time of the violation, plaintiff did not have a clearly established Fourth Amendment right to leave without being subjected to the search, defendant was entitled to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

qualified immunity. The panel held that plaintiff's other causes of action, which included additional Fourth Amendment and due process claims, failed.

## COUNSEL

Travis Barrick (argued), Gallian Welker Beckstrom, Las Vegas, Nevada, for Plaintiff-Appellant.

D. Randall Gilmer (argued), Chief Deputy Attorney General; Frank A. Toddre II, Senior Deputy Attorney General; Aaron D. Ford, Attorney General; Office of the Attorney General, Las Vegas, Nevada; for Defendants-Appellees.

## OPINION

W. FLETCHER, Circuit Judge:

On February 19, 2017, Tina Cates went to visit her boyfriend, Daniel Gonzales, who was incarcerated at High Desert State Prison in Nevada. Prison officials believed Cates intended to smuggle drugs to Gonzales. A female officer took Cates to a bathroom and instructed her to disrobe and remove her tampon. Cates complied, believing that she had no choice, and the officer performed a visual body cavity strip search. Another officer searched her car. He asked permission to search the contents of Cates's phone, and Cates refused to grant permission. No contraband was found. Cates was not allowed to visit Gonzales, and her visiting privileges at the prison were terminated. Cates brought suit against several prison officials under 42 U.S.C. §1983. The district court granted summary judgment to all defendants.

We hold that the defendant who performed the strip search violated Cates's rights under the Fourth Amendment, but that the defendant is protected by qualified immunity.

## I.  Background

Because this case comes before the panel on an appeal of a grant of summary judgment for defendants, we draw all reasonable factual inferences in favor of Cates. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).  We recount the facts viewed through that lens.

At the time of the episode in question, Cates had been dating Gonzales for almost three years.  She had known him for almost twenty years.  Gonzales had been incarcerated at High Desert State Prison ("HDSP") since sometime in 2015 or early 2016.  Cates submitted an application to visit Gonzales, which was approved in approximately August or September of 2016.  After that approval, Cates visited Gonzales weekly.

On February 19, 2017, Cates arrived at HDSP around 11:30 a.m. for her regular visit.  Signs on the premises of the prison alerted visitors that all persons and vehicles on the property were subject to search.  As she had done at the beginning of every previous visit, Cates signed a consent form reading:

> I, the undersigned, being free from coercion, duress, threats or force of any kind, do hereby freely and voluntarily consent to the search of my person, vehicle and other property which I have brought onto prison grounds. I agree that the search maybe [sic] conducted by duly

authorized Correctional Officers of the Department of Corrections or by other law enforcement officers specifically authorized by the Warden. I understand that if I do not consent to the search of my person, vehicle or other property, I will be denied visitation on this date and may also be denied future visits pursuant to Administrative Regulation 719.

Unbeknownst to her, an investigation of Cates had been initiated by a non-party correctional officer of HDSP. Defendant Arthur Emling, Jr., a criminal investigator with the Nevada Office of the Inspector General, stated in his deposition that the investigation was prompted by a tip received from "two confidential credible sources" that Cates might try to bring drugs into the prison. Other than Emling's statement, the record contains no information about the origin or reliability of the tip.

On the day of Cates's visit, Emling had applied for and received a warrant to search Cates's "person," to search "any vehicles used and registered by Cates to transport herself to High Desert State Prison," and to seize "[a]ny and all [i]llegal [c]ontrolled [s]ubstances/[n]arcotics." The warrant did not specifically authorize a visual body cavity strip search of Cates's "person." The warrant was never executed. Defendants do not argue to us that, even if executed, the search warrant authorized a strip search.

After Cates signed the consent form, Emling and Myra Laurian ("Laurian"), a female criminal investigator for the Office of the Inspector General, approached Cates, confirmed her identity, and told her, without explanation, to follow them. Cates believed that Emling and Laurian were "cops"

or prison officials, and that she was in their custody. Cates did not feel free to leave. She stated in her deposition that neither Emling nor Laurian informed her that she was free to leave. Emling and Laurian led Cates to the prison administration building.

Laurian took Cates into a bathroom. Laurian told her to remove her clothing, including her bra and underwear, and to remove her tampon. According to Cates, Laurian "ordered [], and didn't ask" her to bend over and spread her cheeks. Cates complied. She stated in her deposition, "I didn't know if I could [object]. I don't know what the laws are. I was complying to an authority." Laurian found no drugs or other contraband on Cates's person. Despite her prior assurances that she would do so, Laurian did not supply a replacement tampon. Rather, she provided, in Cates's words, "toilet paper to shove down there."

Cates stated in her deposition that she did not consent to the strip search. Rather, she stated that, in signing the consent form she had signed on every prior visit to the prison, she understood that she was consenting only to a "normal search." She understood that she had consented to "[a] search that is a pat-down that they normally do when you go through the prison."

Cates stated that after the strip search Emling told Laurian, "I need you to watch [Cates] while I go search her car." Emling stated in his deposition that "Cates was not detained," and "could leave at any time." However, defendants acknowledge in their brief to our court that "Cates was detained in HDSP administration during the search" of her car. While Laurian detained Cates, Emling took Cates's car

keys from a locker and searched her car. Emling found no drugs or other contraband in Cates's car.

Emling took Cates's phone out of her car and asked for permission to search its contents. Emling then told Cates for the first time that he had a search warrant. He told her that the warrant did not authorize a search of her phone. Cates denied permission to search the contents of her phone. She stated in her deposition that she denied permission because of the personal nature of some of the photographs in her phone.

After Cates refused the search of her phone, prison officials terminated her visit to the prison. Cates left HDSP and drove home. On the way home, she bled through her clothes. Cates did not stop on the way home to buy another tampon because, she stated, "I just wanted to get home and clean myself up and - like, I felt violated. And the fastest thing I wanted to is just get home and - it's an embarrassing thing for a female. You just want to go clean yourself up. It's gross."

On her way home, Cates spoke to Gonzales on the phone. Because Gonzales was incarcerated, the call was recorded. Cates told Gonzales what happened and said that she "fe[lt] violated." Cates told Gonzales that "I told her that she could because, I mean, I'm not bringing drugs in, you know what I mean."

Cates stated in her deposition that the search at HDSP "traumatized me. . . . I've never experienced anything like that in my life. . . . I'm still in shock over it." She stated that she rushed home to clean "[t]he blood, and the violation that I felt from the - having to take my clothes off and spread my cheeks open and all that for the lady." Cates stated, "I have

a clean record. I take pride in that. I'm a law-abiding citizen." Cates took off work and did not leave her house for several days because, she stated: "I was emotionally messed up in the head from the situation that I had gone through at the prison." Cates also increased the dosage of anxiety medication that she had previously been prescribed.

## II. NDOC Guidelines

Nevada Department of Corrections ("NDOC") guidelines, applicable to both inmates and visitors, mandate that "[s]earches [ ] be conducted in a manner that causes the least disruption and affords respect and privacy for the property or person searched. Staff will avoid unnecessary force or embarrassment." "Whenever practical and where there is no undue risk to the officers or employees conducting the search, the person or inmate to be searched will remain within view of the property being searched."

NDOC provides guidance specifically regarding searches of visitors. "Every visitor . . . will be subject to pat down, frisk and personal property searches and may be subject to strip searches. Prior to the search, the visitor will be informed of the type of search to be performed and of the visitor's option to refuse to be searched." "If the planned search is to be a strip search, the visitor must give consent in writing to be strip searched, unless a search warrant has been obtained and a peace officer is present." "Strip searches may only be conducted [if] . . . [t]he person is notified of the right to refuse to be searched and gives written approval," "[t]he search is conducted by two staff members trained in conducting searches and of the same gender as the person being searched," and "[t]he search is conducted in a private area as near the perimeter entrance as possible."

### III. Procedural History

Cates alleged nine causes of action against five different defendants for violation of the First, Fourth, Eighth, and Fourteenth Amendments of the United States Constitution. Cates sought damages as well as injunctive and declaratory relief.

Cates also alleged causes of action under the Nevada state constitution. However, she mentions the Nevada constitution only once in her brief to us, and she cites no Nevada case. She has therefore waived any causes of action under the state constitution. *See Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1148 (9th Cir. 2016).

The district court granted summary judgment to all defendants on all causes of action.

### IV. Standard of Review

We review a district court's grant of summary judgment de novo. *See Zetwick v. Cty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017). "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *Id*. (internal quotation marks and citation omitted). In other words, a plaintiff survives a defendant's motion if she produces "evidence such that a reasonable juror drawing all inferences in [her] favor . . . could return a verdict in [her] favor." *Id.* at 441 (internal quotation marks and citation omitted).

## V.  Discussion

## A.  Fourth Amendment

Cates's only viable cause of action is her claim that the unconsented strip search violated her rights under the Fourth Amendment.  For the reasons that follow, we hold that the strip search violated the Fourth Amendment.  However, we also hold that Laurian, who conducted the strip search, is protected from a damages suit by qualified immunity. Because there is little to no likelihood that Cates might again be subjected to a strip search under comparable circumstances, prospective declaratory and injunctive relief are unavailable.

Qualified immunity protects government officials acting in good faith and under the color of state law from suit under § 1983.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity bars suits against government officials when either (1) no deprivation of constitutional rights was alleged or (2) the law dictating that specific constitutional right was not yet clearly established.  *Id*. at 236.  Courts may begin with either prong of the analysis.  *Id*.

If a constitutional violation is established, satisfying the first prong, the second prong of a qualified immunity analysis asks whether the law prohibiting the action was "clearly established" at the time of the incident in question.  *Id*.  The function of the inquiry under the second prong is to ensure that officials are subject to suit only for actions that they knew or should have known violated the law.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Law is "clearly established" for the purposes of qualified immunity analysis if "every reasonable official would have understood that what he is

doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (internal quotations and citations omitted). An official can be on notice that his conduct constitutes a violation of clearly established law even without a prior case that had "fundamentally similar" or "materially similar" facts. *Hope*, 536 U.S. at 741. In the analysis that follows, we address both prongs.

## 1. Fourth Amendment Violation

The Fourth Amendment prohibits unreasonable searches. U.S. Const. Amend. IV; *Bell v. Wolfish*, 441 U.S. 520, 558 (1979). To determine whether a particular search is unreasonable, the intrusion on the individual's privacy interests must be balanced against "its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979). A prison "is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell*, 441 U.S. at 559. In determining whether a prison search is reasonable under the Fourth Amendment, the prison's "significant and legitimate security interests" must be balanced against the privacy interests of those who enter, or seek to enter, the prison. *Id.* at 560.

It is well-established that prisoners do not shed all constitutional rights at the prison gate, though these rights may be limited or restricted. *See id.* at 545–546; *Sandin v. Conner*, 515 U.S. 472, 485 (1995); *see also Gerber v. Hickman*, 291 F.3d 617, 620 (9th Cir. 2002) (noting that while "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," "it is also clear that imprisonment carries with it the . . . loss of many significant rights" (citations and quotations omitted)).

"Prisoners retain only those rights 'not inconsistent with their status as . . . prisoners or with the legitimate penological objectives of the corrections system.'" *Gerber*, 291 F.3d at 620 (citing *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (alterations omitted)).

Like prisoners, prison visitors retain only those rights that are consistent with the prison's significant and legitimate security interests. But visitors' privacy interests, and their threats to prison security, are distinct from those of inmates and detainees. *See, e.g.*, *Boren v. Deland*, 958 F.2d 987, 988 (10th Cir. 1992); *Daugherty v. Campbell*, 935 F.2d 780, 786 (6th Cir. 1991); *see also Blackburn v. Snow*, 771 F.2d 556, 563 (1st Cir. 1985) (recognizing that "free citizens entering a prison, as visitors, retain a legitimate expectation of privacy, albeit one diminished by the exigencies of prison security"). Any constraints on visitors' rights must be "justified by the considerations underlying our penal system" and their curtailment necessary to the institution's needs. *Hudson*, 468 U.S. at 524 (internal citation omitted).

As we have recognized, "[p]rison officials . . . have a strong interest in preventing visitors from smuggling drugs into the prison." *Mendoza v. Blodgett*, 960 F.2d 1425, 1433 (9th Cir. 1992). Concerns about smuggling drugs and other contraband, such as weapons, into the facility may justify a variety of security screening measures. The nature of permissible screening measures will vary depending on the nature of the threat. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.

While "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 (1976), the unique context of the prison facility does not always require individualized suspicion. Some searches of visitors to "sensitive facilities," like courthouses or prisons, require no individualized suspicion provided that the searches are both limited and necessary. *See McMorris v. Alioto*, 567 F.2d 897, 899 (9th Cir. 1978). Pat-down searches and metal detector screenings of visitors may be conducted as a prerequisite to visitation without any individualized suspicion, given the weighty institutional safety concerns. Such searches are "relatively inoffensive" and "less intrusive than alternative methods," and they may be avoided by the simple expedient of not visiting the prison. *Id.* at 900–01.

Visual body cavity searches, such as the search to which Cates was subjected, are at the other end of the spectrum. "Strip searches involving the visual exploration of body cavities [are] dehumanizing and humiliating." *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 711 (9th Cir. 1990), *abrogated on other grounds by Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam); *see also Bell*, 441 U.S. at 576–77, (Marshall, J., dissenting) (stating that "body-cavity searches . . . represent one of the most grievous offenses against personal dignity and common decency"). "The intrusiveness of a body cavity search cannot be overstated." *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1445 (9th Cir. 1991) (alteration and citation omitted). The Fourth Amendment permits these searches, even of inmates, only in limited circumstances. *See Bell*, 441 U.S. 520, 558–60 (upholding policy of visual body cavity strip searches of inmates after contact visits); *Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 566 U.S. 318 (2012) (upholding similar searches of detainees

before they are introduced into the general population of a facility); *Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (en banc) (upholding policy of strip searches of arrestees before introduction into the general jail population); *see also Edgerly v. City and County of San Francisco*, 599 F.3d 946, 957 (9th Cir. 2010) (strip search of an arrestee never placed in the general jail population requires reasonable suspicion).

Prisoners may be subjected to visual body cavity strip searches based on "reasonable suspicion" in order "to protect prisons and jails from smuggled weapons, drugs or other contraband which pose a threat to the safety and security of penal institutions." *Fuller*, 950 F.2d at 1447; *see also Kennedy*, 901 F.2d at 715. However, such searches "are valid only when justified by institutional security concerns." *Fuller*, 950 F.2d at 1447. In circumstances where they threaten prison security, prison *visitors* may be strip searched when based on reasonable and individualized suspicion. *See Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000) (recognizing "a long and unbroken series of decisions by our sister circuits" finding "strip searches of prison visitors . . . unconstitutional in the absence of reasonable suspicion that the visitor was carrying contraband"); *see, e.g.*, *Blackburn*, 771 F.2d at 566–67 (rejecting "appellants' attempt to impute or casually transfer to free citizens visiting a prison the same circumscription of rights suffered by inmates"); *Calloway v. Lokey*, 948 F.3d 194, 202 (4th Cir. 2020) (stating that "the standard under the Fourth Amendment for conducting a strip search of a prison visitor—an exceedingly personal invasion of privacy—is whether the prison officials have a reasonable suspicion, based on particularized and individualized information, that such a search will uncover contraband on the visitor's person on that occasion").

However, even where there is reasonable suspicion that a prison visitor is carrying contraband, a strip search is permissible only if it can be justified by a legitimate security concern. *See Fuller*, 950 F.2d at 1447. That justification does not exist when the visitor is not in a position to introduce contraband into the prison. For example, there is no legitimate security justification when a visitor is still in an administrative building of the prison with no possibility of contact with a prisoner. Only when a visitor could introduce contraband into the prison is the risk comparable to that posed by a prisoner who returns to the general prison environment after contact with a visitor, or a detainee who is placed with the general prison population after booking. *See Bell*, 441 U.S. 520; *Florence*, 566 U.S. 318.

A critical distinction between a visitor, on the one hand, and a prisoner or detainee, on the other, is that a visitor can leave the administrative area of a prison without ever coming into contact with a prisoner. The Sixth Circuit relied on this distinction in *Spear v. Sowders*, 71 F.3d 626 (6th Cir. 1995) (en banc), to hold that a prison visitor could be compelled to submit to a digital body cavity strip search based solely on reasonable suspicion only if the visitor was given the opportunity to terminate her visit and depart instead. Kentucky prison officials believed Spear was bringing drugs to an inmate during her visits. They refused to allow her into the prison proper, where she would have had contact with prisoners, and they refused to allow her to leave the administrative area of the prison without submitting to a body cavity strip search. *Id.* at 628–29. The search "embarrassed, humiliated, and demeaned her." *Id.* at 629. The court held that "the residual privacy interests of visitors in being free from such an invasive search requires that prison authorities have at least a reasonable suspicion that the visitor is bearing

contraband before conducting such a search." *Id.* at 630. The court held further that even if there was reasonable suspicion that Spear was carrying drugs, she had a "right not to be searched for administrative reasons without having a chance to refuse the search and depart." *Id.* at 632. The court noted that "the same logic that dictates that such a search may be conducted only when there is reasonable suspicion also demands that the person to be subjected to such an invasive search be given the opportunity to depart." *Id.*

The Seventh Circuit has endorsed the reasoning of *Spear*: "[I]f a visitor showed up at the gates of the prison and was told that anyone who visits an inmate has to submit to a strip search, and replied that in that event she would not visit him, the guards would not seize her and subject her to the strip search anyway—or if they did, they would be violating the Fourth Amendment. . . . The visitor thus always had the legal option of avoiding the strip search by forgoing the visit." *Burgess*, 201 F.3d at 945. *See also Stephen v. MacKinnon*, No. CIV.A. 94-3651-B, 1997 WL 426972, at *6 (Mass. 1997) (finding "[t]he portion of the search which occurred after Ms. Stephen expressed her wish to leave . . . unreasonable and in violation of [her] constitutional right to be free of an unreasonable search"); *Shields v. State*, 16 So. 85, 86 (Ala. 1894) (describing "[t]he examination or search must be voluntary on the part of [visitors]. If they do not consent, admission to the jail or access to the prisoners may be refused").

Using a similar analysis, the Eighth Circuit found a Fourth Amendment violation when a visitor—who had already finished her visit to the jail and was therefore "no longer in a position to smuggle contraband" and "no longer posed a threat to prison security"—was subjected to a visual

body cavity strip search. *Marriott By and Through Marriott v. Smith*, 931 F.2d 517, 518, 520 (8th Cir. 1991). In *Hunter v. Auger*, 672 F.2d 668, 675 (8th Cir. 1982), the Eighth Circuit had previously held that visitors may be subjected to strip searches if there are "reasonable grounds . . . to believe that a particular visitor will attempt to smuggle contraband" into the prison. The court wrote in *Marriott* that "[t]he mere fact that this case and *Hunter* involved people who had gone to visit prisoners is a superficial similarity. That similarity does not justify an officer relying on *Hunter* when the purpose for the *Hunter* rule does not exist." 931 F.2d at 521.

We agree with the Sixth, Seventh and Eighth Circuits. Our agreement with our sister circuits follows naturally from our precedent on prison searches and on screening measures in sensitive facilities more generally. In upholding a blanket policy requiring strip searches of admittees to the county jail in *Bull*, we specifically noted that we were not "disturb[ing] our prior opinions considering searches of arrestees who were not classified for housing in the general jail or prison population." 595 F.3d at 981. Our rationale in *Bull*, like the Supreme Court's rationale in *Bell*, 441 U.S. 520, was based on the jail's security interests *within* the jail. *See Bull*, 595 F.3d at 981 n.17 ("The strip search policy at issue in this case, and our holding today, applies *only* to detainees classified to enter the general corrections facility population." (emphasis added)); *see also Bell*, 441 U.S. at 558 (upholding searches of "[i]nmates at all Bureau of Prison facilities . . . after every contact visit with a person from outside the institution"). We specifically noted in *Bull* that "searches of arrestees at the place of arrest, searches at the stationhouse prior to booking, and searches pursuant to an evidentiary investigation must be analyzed under different principles than those at issue today." *Id.* at 981.

Because the ability of prison officials to conduct strip searches of visitors based on reasonable suspicion is premised on the need to prevent introduction of contraband into the prison, a search of a visitor who no longer intends to enter the portion of the prison where contact with a prisoner is possible, or who was leaving the prison, must rely on another justification.    Ordinarily, a visitor cannot introduce contraband into the prison simply by appearing in the administrative area of the prison.   If prison officials have reasonable suspicion that such a visitor is carrying contraband, the prison's security needs would justify a strip search only if the visitor insists on access to a part of the prison where transfer of contraband to a prisoner would be possible.   If the visitor would prefer to leave the prison without such access, the prison's security needs can be satisfied by simply letting the visitor depart.

NDOC's own guidelines support this analysis.   As we noted above, they provide:

> Prior to the search, the visitor will be informed of the type of search to be performed and of the visitor's option to refuse to be searched.  If the planned search is to be a strip search, the visitor must give consent in writing to be strip searched, unless a search warrant has been obtained and a peace officer is present.  In the absence of a search warrant, any person not giving permission to search upon request will be required to leave the institution/facility grounds.

The guidelines continue: "Strip searches may only be conducted [when] [t]he person is notified of the right to

refuse to be searched and gives written approval to be searched per the 'Consent to Search' form." The NDOC's guidelines are of course based on the security needs of the prison. Notably, the guidelines in no way suggest that it is necessary for institutional security to conduct a search of a visitor who prefers to leave the prison rather than subject herself to a strip search. Prison regulations in many states are similar. *See, e.g.*, Ill. Admin. Code § 2501.220(a)(3) (permitting strip searches of visitors only if there is "reasonable suspicion that the visitor may be in possession of contraband or be attempting to transport contraband into the facility" *and* "[t]he visitor [is] informed that he may refuse to submit to the search . . . and may be denied the visit unless he specifically consents in writing to a strip search"); N.Y. Admin. Code § 200.2(f) (describing a "visitor must be informed that he/she has the option to submit . . . or to refuse"); Miss. Admin. Code Pt. 2, R. 2.1.5(4) ("When any visitor is believed, upon reasonable suspicion, to be carrying contraband, they will be asked to consent to a strip search and/or body cavity search.").

In other circumstances or settings, a refusal to allow someone to depart rather than submit to a search may be justified by legitimate security needs. For example, we held in *U.S. v. Aukai*, 497 F.3d 955, 960 (9th Cir. 2007) (en banc), that a would-be airplane passenger could be subjected to a pat-down, empty-your-pockets search once he had entered the security area, even though he expressed a desire to leave rather than be subjected to the search. We held that a rule allowing the would-be passenger to depart in such a circumstance would "make[] little sense in a post-9/11 world." *Id.* Rather, such a rule

would afford terrorists multiple opportunities to attempt to penetrate airport security by 'electing not to fly' on the cusp of detection until a vulnerable portal is found. This rule would also allow terrorists a low-cost method of detecting systematic vulnerabilities in airport security, knowledge that could be extremely valuable in planning future attacks.

*Id.* at 960–61.

Our decision in *Aukai* is entirely consistent with a holding that a prison visitor who does not insist on access to the prison proper must be allowed to leave rather than be subjected to a strip search. First, prisons are not faced with the same sort of security threats as airports. Our rationale in *Aukai* made perfect sense in the context of airport screening, where a terrorist is intent on bringing down an airplane—any large passenger airplane—and needs to find a soft spot at only one airport—any significant airport—to do enormous damage. By contrast, a prison visitor intent on bringing contraband into a prison is typically interested in bringing contraband to a particular person or group of people in *that* prison. Second, the search in *Aukai* was not intrusive. The would-be passenger was only wanded, patted down, and asked to empty his pockets. An entirely different case would have been presented in *Aukai* if an unconsented strip search had been at issue.

We are aware that in *U.S. v. Prevo*, 435 F.3d 1343 (11th Cir. 2006), the Eleventh Circuit relied on airport search cases to reject an argument that a person should have been allowed to leave a prison parking lot rather than have her car searched. The court wrote that an option to leave

would constitute a one-way street for the benefit of a party planning airport mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful. As we observed, established search procedures are more valuable for what they discourage than what they discover. Any policy that reduces the likelihood of a successful search will decrease the risk to the wrongdoer. A policy allowing the wrongdoer to back out on the brink of discovery reduces the risk to zero, leaving her free reign to probe the security measures until an opening is found.

*Id.* at 1348–49 (citations and alterations omitted). The Eleventh Circuit's concerns are not compelling when applied to an unconsented strip search of a visitor who would prefer to leave rather than be searched. A strip search is humiliating and intrusive. Moreover, in *Prevo* some prisoners had access to the parking lots at the prison. *See Prevo*, 435 F.3d at 1347 (noting that the pistol on the front seat of a visitor's car would be "accessible to prisoners passing by who were inclined to wrongdoing," and concluding that "[a]t least where inmates have access to cars parked in prison facility parking lots, a search of the vehicle is reasonable"); *see also Neumeyer v. Beard*, 421 F.3d 210, 211 (3rd Cir. 2005) ("Notably, some inmates have outside work details and such inmates may have access to visitors' vehicles parked at the prison.") (quotation omitted); *McDonell v. Hunter*, 809 F.2d 1302, 1309 (8th Cir. 1987) (finding "it is not unreasonable to search [employee] vehicles that are parked within the institution's confines where they are accessible to inmates").

The court in *Spear* drew a similar distinction between strip searches and vehicle searches.  *See Spear*, 71 F.3d at 633.  While holding that Spear should have been given an opportunity to leave before being subjected to a body cavity strip search based on reasonable suspicion, the court refused to hold that the search of her car located on prison grounds was unreasonable.  It noted that "while unpleasant, the nature of an automobile search is far less intrusive than a strip and body cavity search, and the interest in preventing the introduction of contraband remains as great."  *Id.*; *see also Romo v. Champion*, 46 F.3d 1013, 1019 (10th Cir. 1995) (stating that a "strip search is a far cry from the routine, rather nonintrusive search initially conducted by defendants at the roadblock . . . the strip search of an individual by government officials, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience") (quotation omitted).  It further distinguished the two searches based on the fact that contraband hidden on or inside a person would only be transferred to a prisoner through contact with the prisoner while "an object secreted in a car, to which prisoners may have access, is a potential threat at all times after the car enters the grounds."  *Spear*, 71 F.3d at 633.

Even if there was reasonable suspicion that Cates was seeking to bring drugs into the prison (a question we do not reach), Laurian violated her rights under the Fourth Amendment by subjecting her to a strip search without giving her the option of leaving the prison rather than being subjected to the search.

### 2.  Qualified Immunity

We have concluded, in agreement with three of our sister circuits, that Laurian violated Cates's rights under the Fourth

Amendment by subjecting her to a strip search without giving her an opportunity to leave rather than be subjected to the search. We hold, however, that prior to our decision in this case the contours of the right in this circuit were not "sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right," and accordingly extend qualified immunity. *Jessop v. City of Fresno*, 936 F.3d 937, 940–41 (9th Cir. 2019) (en banc) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The Supreme Court and our court have addressed strip searches of detainees. But when Cates was subject to the strip search at issue in this case, there was no case in this circuit where we had held that a prison visitor has a right to leave the prison rather than undergo a strip search conducted on the basis of reasonable suspicion. While we "do not require a case directly on point, . . . existing precedent must have placed the . . . question beyond debate." *Al-Kidd*, 563 U.S. at 741. Cases allowing strip searches of detainees support a holding that Cates's rights under the Fourth Amendment were violated primarily based on their differences from, rather than their similarities to, Cates's case. Additionally, while "in a sufficiently 'obvious' case of constitutional misconduct, we do not require a precise factual analogue in our judicial precedents," we have noted that this "exception . . . is especially problematic in the Fourth-Amendment context" where officers are confronted with "endless permutations of outcomes and responses." *Sharp v. County of Orange*, 871 F.3d 901, 911–12 (9th Cir. 2017).

Existing case law has already clearly established that a strip search of a prison visitor conducted without reasonable suspicion is unconstitutional. We do not reach the question whether there actually was reasonable suspicion that Cates

was carrying drugs on her person. But, for purposes of a qualified immunity analysis, it was not unreasonable for Laurian to have believed that there was reasonable suspicion, given that a search warrant (though unexecuted) had been issued for a search of Cates's "person" for drugs. However, prior to our decision in this case, there has been no controlling precedent in this circuit, or a sufficiently robust consensus of persuasive authority in other circuits, holding that prior to a strip search a prison visitor—even a visitor as to whom there is reasonable suspicion—must be given an opportunity to leave the prison rather than be subjected to the strip search.

## B. Other Causes of Action

We hold that Cates's other alleged causes of action all fail. Cates alleges two additional Fourth Amendment causes of action: that Emling and Laurian violated the Fourth Amendment when they detained her while searching her car, and again when they took her phone. Neither allegation states a constitutional violation. Some form of temporary detention while they searched Cates's car was permissible because officers' "authority to detain incident to a search is categorical." *Muehler v. Mena*, 544 U.S. 93, 98 (2005). Cates's detention during the search of her car lasted for only a few minutes and did not involve serious physical restriction. The brief moment when Defendant Emling was holding Cates's phone and asking her for the passcode (which Cates refused to provide) did not "meaningful[ly] interfere[] with [her] possessory interests in" her phone. *United States v. Brown*, 884 F.2d 1309, 1311 (9th Cir. 1989).

Cates alleges three due process causes of action: she contends that her due process rights were violated when

(1) Emling and Laurian failed to give her a copy of the search warrant; (2) a prison official denied her access to the prison on February 17 without reasoning or appeal; and (3) other prison officials indefinitely suspended her permission to visit the prison.  Cates's first due process cause of action fails because the warrant was never executed, and she cites no law requiring the production of an unexecuted warrant.  *See United States v. Silva*, 247 F.3d 1051, 1058 n.4 (9th Cir. 2001).  Cates also cites no caselaw supporting her second and third due process causes of action.

Cates alleges other causes of action, including that (1) "she was retaliated against under the First Amendment" after "she reasonably refused to provide [Emling] the password to her cell phone, something she had a protected [First] Amendment right to do"; (2) her Eighth Amendment right to be free from cruel and unusual punishment was violated; and (3) prison officials violated her right to equal protection by terminating her visitation while not doing the same to other, similarly situated individuals.  None of these other causes of actions has merit.

## Conclusion

The unconsented strip search to which Cates was subjected, without giving her the option of leaving the prison rather than being subjected to the search, was unreasonable under the Fourth Amendment.  However, because at the time of the violation Cates did not have a clearly established Fourth Amendment right to leave without being subjected to the search, Laurian is entitled to qualified immunity.  Cates's

other causes of action fail.  We affirm the district court's award of summary judgment to defendants.

**AFFIRMED.**